**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **HEATHER TRAUTMAN** | § | |
| | § | |
| **V.** | § | **A-16-CV-1049-LY** |
| | § | |
| | § | |
| **TIME WARNER CABLE TEXAS, LLC** | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO: THE HONORABLE LEE YEAKEL
 UNITED STATES DISTRICT JUDGE

Before the Court are Defendants' Motion for Summary Judgment (Dkt. No. 22); Plaintiff's Response (Dkt. No. 27); Defendants' Reply (Dkt. No. 30); Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 23); Defendant's Response (Dkt. No. 26); and Plaintiff's Reply (Dkt. No. 29). The undersigned submits this Report and Recommendation to the United States District Court pursuant to 28 U.S.C. § 636(b) and Rule 1(h) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges.

## I.   Background

This is a disability discrimination and retaliation case alleging claims pursuant to the ADA and FMLA. Plaintiff Heather Trautman was employed as a Workforce Analyst for Time Warner Cable beginning in October of 2012, until her termination on April 9, 2015. (Dkt. No. 22, Ex. 1, Trautman Dep. at 33:22-25; 68:21-69:10). Initially, Trautman reported to Time Warner Cable's office in North Austin from 8:00 am to 5:00 pm each day. (Dkt. No. 22, Ex. 1, Trautman Dep. at 78:6-11). In June 2013, about eight months into her employment, Trautman requested an accommodation for a pregnancy-related medical condition. (Dkt. No. 22, Ex. 6, June 27, 2013 ADA Physician Cert.). Trautman requested a place to lie down during the work day in the event she

became dizzy or experienced bleeding. *Id.* Time Warner determined Trautman's condition was not a disability under the ADA at the time, but provided Trautman with an area to lay down, if necessary, during her pregnancy. (Dkt. No. 22, Ex. 7, Resp. to Employee Accommodation Req.).

During this same time period, Trautman alleges she experienced two panic attacks while driving in heavy traffic. (Dkt. No. 22, Ex. 1, Trautman Dep. at 11:23-12:24; 13:11-18). Trautman's obstetrician advised that she avoid driving in traffic and suggested she work from home. *Id.* at 16:20-17:6. Trautman's obstetrician prepared a note for Trautman to present to her then-supervisor, Brian Kingery, regarding the requested temporary modification to her work hours:

> PREGNANCY RECOMMENDATIONS
>
> Heather Trautman is an established patient in my obstetrical practice. Her estimated date of delivery is 12/28/13. Please allow her to leave work early for traffic issues and finish her work day from home.

(Dkt. No. 22, Ex. 8, Sept. 25, 2015 Doctor's Note). Because of this recommendation from her doctor, from August 2013 to December 2013 (when her daughter was born), Time Warner allowed Trautman to work a modified schedule where she left work at 2:00 p.m., and then worked from home a portion of the afternoon or evening. (Dkt. No. 22, Ex. 1, Trautman Dep. at 17:7-18:13; 97:5-13).

Following the December 2013 birth of her daughter, Trautman requested and received twelve weeks of FMLA leave. *Id.* at 110:16-111:2. In March 2014, Trautman's pregnancy-related FMLA leave expired. (Dkt. No. 22, Ex. 1, Trautman Dep. at 111:22-112:2). When the time came for Trautman to return to work, Trautman approached her then-manager, Christopher Graham, and requested to work from home until her daughter could transition to a bottle. (Dkt. No. 22, Ex. 1, Trautman Dep. at 112:22-113:3). The transition to the bottle took nine months and Trautman worked from home from March 2014 to January 2015, which is after her daughter's first birthday. *Id.* at 113:18-24.

In October 2014, Adrienne Greth became Trautman's manager. (Dkt. No. 22, Ex. 1, Trautman Dep. at 115:14-19; Ex. 4, Greth Dep. at 11:1-12:5). Greth initially reached out to determine why Trautman worked from home and then asked that Trautman plan to return to work in the office in January 2015. (Dkt. No. 22, Ex. 1, Trautman Dep. at 115:20-118:2; Ex. 9, Greth Dec. 9, 2014 Email). Trautman requested permission to resume the 8:00 am to 2:00 pm modified schedule Kingery had previously granted during her pregnancy. *Id.* 127:1-128:1. Greth denied her modified schedule request for 2015. *Id.*

On or around December 12, 2014, before the return to office work commenced, Trautman submitted a request for an ADA accommodation through Human Resources of a permanent modified schedule to either work from home or work a revised schedule from 7:00 a.m. to 2:00 p.m. (Dkt. No. 22, Ex. 10, Req. for Accommodation). Trautman's doctor certified that Trautman experienced "anxiety/panic attacks related to traffic/driving" and described her disability as the "inability to drive in heavy traffic." *Id.* at 3-4. According to Trautman's December 12, 2014, request, her anxiety condition imposed "no limitations for the function of [her] job duties." *Id.* at 6.

On January 9, 2015, Time Warner denied the request for accommodation. (Dkt. No. 27, Ex. 6). Greth determined it was not feasible to provide Trautman with a permanent work-from home accommodation because the essential functions of Trautman's workforce analyst position required her to be present and available in the office during normal business hours. (Dkt. No. 22, Ex. 4, Greth Dep. at 100:11-104:12; Ex. 11, Resp.to Req. for Accommodation; Ex. 12, Greth Accommodation Analysis Email). The denial letter stated that the reason for the denial was that "the request and accommodation are not related to an essential function of the employee's job." The document further states that "Heather's position requires her to work from the office during normal business hours and

is not a work from home position." However, as an alternative, Time Warner offered Trautman a 7:00 a.m. to 4:00 p.m. schedule. *Id.*

On January 14, 2015, after Trautman rejected Time Warner's alternative schedule, Trautman contacted Time Warner's third-party administrator (Sedgwick) to initiate a claim for intermittent FMLA leave. (Dkt No. 22, Ex. 1, Trautman Dep. at 172:17-173:15; Ex. 14, FMLA Eligibility Notice). Trautman's February 5, 2015, certification came in one day past the fifteen day deadline and contained incomplete information. (Dkt. No. 22, Ex. 16, Feb. 5, 2015 Cert.;Ex. 17, Feb. 5, 2015 Cert. Deficiency Ltr.; Ex. 1, Trautman Dep. at 174:4-175:16). Trautman's treating physician had failed to complete the frequency and duration section of the certification form so Sedgwick requested of Trautman: "Please also have the doctor answer question #7 and provide a frequency and duration for the flare-ups of your illness that may require you to miss time from work, if applicable." (Dkt. No. 22, Ex. 17, Feb. 5, 2015 Cert. Deficiency Ltr.). On February 9, 2015, Trautman submitted an updated certification, which included check marks in response to Sedgwick's prompts for information related to the frequency and duration of her condition. (Dkt. No. 22, Ex. 18, Feb. 9, 2015 Updated Cert.). Sedgwick interpreted Dr. Hart's check marks and notations to certify Trautman for one episode per week, with each episode lasting up to one hour, and issued a certification reflecting approval of such. (Dkt. No. 22, Ex. 19, Feb. 20, 2015 FMLA Cert.). Sedgwick then issued a denial for Trautman's numerous absences between January 14, 2015 and February 20, 2015, that exceeded this one-hour-per-week certification. (Dkt. No. 22, Ex. 20, Feb. 20, 2015 Denial Ltr; Ex. 22, ViaOne Claim History).

In January and February 2015, during the same time period that Trautman initiated her FMLA claim, she began to accrue numerous unexcused absences separate and apart from her FMLA-related absences. Trautman accrued nineteen unexcused, non-FMLA absences over a period of thirty-five

work-days. (Dkt. No. 22, Ex. 21, Feb. 24, 2015 Written Warning). This included eighteen full-day absences as well as a six hour absence on January 20, a three hour absence on February 10, and numerous instances in which she left the office outside those times certified by her treating physician for purposes of her intermittent FMLA claim. (Dkt. No. 22, Appx. B). Four of these absences were accrued on January 5, 12, 13, and 14, 2015, before Trautman initiated her FMLA claim. *Id.* As of February 24, 2015, Trautman had accrued a total of 179 total hours of unexcused absences. On February 24, 2015, Greth issued Trautman a Written Warning for her unexcused absences. (Dkt. No. 22, Ex. 21, Feb. 24, 2015 Written Warning). Before issuing Trautman any discipline related to her attendance, Greth reviewed the information in Sedgwick's ViaOne system to confirm that none of the absences included in the Written Warning were FMLA-approved. (Dkt. No. 22, Ex. 4, Greth Dep. at 33:13-18; Ex. 22, ViaOne Claim History). Trautman continued to accrue unexcused absences. On March 2, 2015, Greth issued a Final Written Warning to Trautman. This Final Written Warning stated:

> On the afternoon of 2/24, you left unauthorized 2 hours prior to the end of the time that you are expected to be in the office. In addition, you called in sick Wednesday 2/25, Thursday 2/26 and Friday 2/27. This is a total of 22 days out of the office or 200 hours since the beginning of the year.

(Dkt. No. 22, Ex. 23, March 2, 2015 Final Written Warning).

On March 2, 2015, Trautman submitted another medical certification from her treating physician stating Trautman was certified to be absent from work for up to five episodes a week, with each episode lasting one hour and thirty minutes. (Dkt. No. 22, Ex. 24, Feb. 27, 2015 Cert). Sedgwick reviewed this second certification and subsequently approved Trautman for up to two hours a day, five days a week of leave, effective March 2, 2015. (Dkt. No. 22, Ex. 25, Mar. 20, 2015 Cert. Ltr.; Ex. 1, Trautman Dep. at 196:16-197:19 Ex. 26, ViaOne Claim Summary). The Response stated that "[w]e have reviewed your request for intermittent leave and have approved your leave

under the Federal Family and Medical Leave Act (FMLA) from January 14, 2015 through August 27, 2015." After the newly approved certification, Greth granted Trautman the following absence exceptions that were not approved FMLA time: Tuesday, March 24, 7:00 am to 1:00 pm work from home, 2:00 pm to 4:00 pm PTO; Friday, April 3, 1:00 pm to 4:00 pm leave early; and Monday, April 6, 7:00 am to 11:00 am sick, 12:00 pm to 4:00 pm work from home. (Dkt. No. 22, Ex. 26, Termination Form).

On April 8, 2015, Trautman contacted Greth to advise that she would not be at work that day because her babysitter was sick. (Dkt. No. 22, Ex. 27, Termination Form). On April 9, 2015, Greth decided to end Trautman's employment for excessive absences. (Dkt. No. 22, Ex. 27, Termination Form; App. B, Absence Summary). Greth included in Trautman's termination form details of the unexcused absences she considered in making the decision to terminate Trautman. *Id.*

## II.     Summary Judgment Standard

Summary judgment is proper when the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The main purpose of summary judgment is to dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Id.* at 323. If the moving party meets this burden, the non-moving party must come forward with specific facts that establish the existence of a genuine issue for trial. *ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832, 839 (5th Cir. 2012). The function of summary judgment is to allow for parties to preempt litigation by demonstrating that "one or more of the essential elements of a claim or defense before the court is not in doubt and that, as a result, judgment should be entered on the basis of purely legal considerations." *Fontenot v. Upjohn Co.*,

780 F.2d 1190, 1194 (5th Cir. 1986). In deciding whether a fact issue exists, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving part, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 389 (1968)).

## III. Analysis

Trautman asserts two causes of action: (1) disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and the Texas Commission on Human Rights Act, Texas Labor Code § 21.001 *et seq.*, for failing to accommodate her disability and for discharging her; and (2) violations of the Family and Medical Leave Act, 29 U.S.C. § 2612 *et seq.*, for retaliating against Trautman and terminating her while she was on approved FMLA leave.

### A. ADA and Texas Labor Code claim

The ADA prohibits discrimination in employment against a qualified individual on the basis of his disability. 42 U.S.C. § 12112(a). Both the ADA and Texas Labor Code prohibit disability discrimination. "Texas courts look to analogous federal precedent for guidance when interpreting the [TCHRA]." *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 473-74 (5th Cir. 2006) (quotations omitted). Thus, federal courts look to federal precedent in decisions on the ADA in interpreting the analogous Texas act. *Id.* The Court will therefore analyze both claims under the terms of the ADA. Trautman makes two separate claims under the ADA, one for disability discrimination, and the second for failure to accommodate.

1.     **Disability discrimination claim**

Discrimination cases under the ADA are conducted under a burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a prima facie case of discrimination under the ADA, a plaintiff must present evidence showing (1) she suffers from a disability; (2) she is qualified for the job; (3) she was subject to an adverse employment action because of her disability; and (4) she was replaced by or treated less favorably than non-disabled employees. *E.E.O.C. v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009). Trautman asserts that she is disabled because she suffers from a form of anxiety which limits her ability to drive. (Dkt. No. 27, Ex. 8, Trautman Depo. 11:22-17:6). Time Warner asserts that Trautman cannot make out a disability discrimination claim because she cannot establish that she qualifies as "disabled" under the relevant statute.

A "qualified person with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  A disability is "a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment." *Id.* § 12102(2).  The ADAAA states that "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Time Warner asserts that "driving" is not a "major life activity" disqualifying Trautman from application under the statute.   Trautman responds that her driving phobia qualifies as an

anxiety/panic disorder which other courts have recognized as a disability under the ADA. Additionally, she asserts that while driving itself may not qualify as a "major life activity," driving in traffic triggers her anxiety, which substantially limits her major life activity of concentrating. In her ADA Physician Certification dated December 8, 2014, her physician, Dr. Steven Hart, stated that Trautman suffers from anxiety/panic attacks related to traffic/driving." (Dkt. No. 22, Ex. 12). He identified the major life activity impaired as "driving" and the extent impaired as "inability to drive in heavy traffic" and stated that she needed to work from 7:00 a.m. to 2:00 p.m. to avoid heavy traffic. *Id.*

Trautman's driving anxiety does limit a major life activity sufficient to establish a disability under the ADA. While an anxiety or panic disorder may qualify as an impairment under the ADA, Trautman does not claim to have such a disorder that impairs her generally. Instead, she claims that the only activity impacted by the disorder is her ability to drive in heavy traffic. Under Fifth Circuit law, driving is not a major life activity. *See Wilson v. Capitol Transp. Corp.*, 2000 WL 1568200 (5th Cir. 2000) at *1 ("Driving may be ubiquitous in our society, but we are not prepared to hold today that driving is a major life activity for ADA purposes"); *Galvan v. City of Bryan*, 367 F.Supp.2d 1081, 1087 (S.D. Tex. 2004); *Webster v. Texas Eng'g Ext. Serv.*, 1999 WL 261925, at *5 (N. D. Tex.1999) ("Driving is not a major life activity."). Moreover, Trautman claims her anxiety is triggered not by driving in-and-of itself, but only by driving in heavy traffic. Trautman must both have a "a physical or mental impairment" that "substantially limits one or more major life activities." An anxiety diagnosis that only limits driving in heavy traffic does not qualify under the ADA.[1]

---

[1] It has not escaped the Court's notice that, if recognized as a disability, Trautman's claimed disorder would conveniently give her a legally protected right to only work at her office when she can get there in light traffic—a "right" the entire working world would welcome.

Trautman tries to circumvent the caselaw establishing that driving is not a major life activity with the argument that driving in traffic causes her anxiety which then affects her ability to concentrate, and the ability to concentrate *is* a major life activity. Specifically, Trautman testified that her driving anxiety affected her ability to concentrate on her work because she became anxious in anticipation of her 45 minute to one hour drive home in heavy traffic. (Dkt. No. 27, Ex. 4, Trautman Decl.). This argument is totally devoid of merit. In her deposition, Trautman testified that she is able to work, care for her four children, run errands and grocery shop in spite of her alleged disorder. (Dkt. No. 22, Ex. 1, Trautman Depo. at 20:19-22:14). Additionally, Trautman's note from her physician, Dr. Hart, states:

> Ms. Trautman has a severe driving phobia that results in disabling anxiety and panic *while driving*. She is having medical treatment for this though presently is unable to drive without these symptoms. Please consider work from home if possible. *She is functional otherwise and should have no other difficulty working.*

(Dkt. No. 22, Ex. 13, Jan. 13, 2015 Dr. Hart note) (emphasis added). Thus, Trautman's own doctor states that her anxiety is limited to the time while she is actually driving and that she is "functional otherwise." Other than her own statements, the summary judgment evidence does not support that Trautman's ability to concentrate is affected by driving-related anxiety. A party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary. *Smith v. Southwestern Bell Tel. Co.*, 456 Fed. Appx. 489, 492 (5th Cir. 2012). Accordingly, the Court finds that Trautman is not "disabled" pursuant to the ADA and cannot bring a claim under the statute.

Apparently recognizing that her driving phobia does not qualify as a disability, Trautman asserts that she is bringing her claim of disability discrimination under the "regarded as" prong of the ADAAA. (Dkt. No. 27 at 19). The Act states:

> One is regarded as having a substantially limiting impairment if the individual (1) has an impairment which is not substantially limiting but which an employer perceives as constituting a substantially limiting impairment; (2) has an impairment which is substantially limiting only because of the attitudes of others toward such an impairment; or (3) has no impairment at all but is regarded by the employer as having a substantially limiting impairment.

42 U.S.C. § 12102(2)(C); *Bridges v. City of Bossier*, 92 F.3d 329, 332 (5th Cir. 1996). Trautman's claim that she was "regarded as" impaired is not supported by the evidence and she cites to no evidence in support. Indeed, the undisputed evidence demonstrates the contrary—Time Warner rejected Trautman's request for an ADA accommodation maintaining that Trautman could attend work on a full time basis. (Dkt. No. 22, Ex. 11, Denial of ADA Accommodation and Ex. 9, Greth E-mail Setting Out Expectations). There is no evidence that anyone at Time Warner "regarded" Trautman as disabled or impaired. Trautman cannot make out a "regarded as" claim under the ADA.

### 2. Failure to accommodate

To establish a discrimination claim for failure to accommodate, a plaintiff must show, among other things, that she suffers from a disability. 42 U.S.C. § 12111(8); *Mzyk v. N.E. Indep. Sch. Dist.*, 397 F. App'x 13, 16 n. 3 (5th Cir. Sept.30, 2010). Because Trautman's driving anxiety does not qualify as a "disability" pursuant to the ADA, Time Warner has no duty to accommodate her, and her failure to accommodate claim also fails.[2]

### B. FMLA claims

The FMLA allows qualified employees up to 12 work weeks of leave during any 12-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Under Section § 2615(a)(1)

---

[2]Employers have no duty to accommodate employees only "regarded as" having a disability. ADA Amendments Act of 2008, Sec. 6 § 501 (l)(h), 122 Stat. 3553, 3558.

of the Act, an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any right provided under the FMLA. The Act also makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2).

Section 2615(a) of the Act creates two types of claims: (1) *interference claims*, in which an employee asserts that her employer denied or otherwise interfered with her substantive rights under the FMLA, and (2) *retaliation claims*, in which an employee asserts that her employer discriminated against her because she engaged in activity protected by the FMLA. A major distinction between these two types of claims is that interference claims do not require a showing of discriminatory intent, whereas retaliation claims do require such proof. *See Cuellar v. Keppel Amfels, L.L.C.*, 731 F.3d 342, 349 (5th Cir. 2013) (J. Elrod, concurring). In addition, the majority of courts hold that the *McDonnell Douglas* burden-shifting analysis does not apply to interference claims under the FMLA, but does apply to retaliation claims. *See Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 712 (7th Cir. 1997); *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011); *Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 332 (1st Cir.2005); and *Smith v. CVS Caremark Corp.*, 2013 WL 2291886, *3 at n. 4 (N.D. Tex. May 23, 2013).

**1.      Interference claim**

In order to establish a prima facie case of interference, Trautman must show that: (1) she was an eligible employee; (2) her employer was subject to the FMLA's requirements; (3) she was entitled to leave; (4) she gave proper notice of her intention to take FMLA leave; and (5) her employer denied her the benefits to which she was entitled under the FMLA that prejudiced her. *Lanier v.*

*Univ. of Tex. Sw. Med. Ctr.*, 527 F. App'x 312, 316 (5th Cir. 2013); *Cuellar v. Keppel Amfels, L.L.C.,* 731 F.3d 342, 347 (5th Cir. 2013). In her Complaint, Trautman states

> In addition, an employee who takes FMLA leave under section 2612 shall be entitled, on return from such leave, to be restored by the employer to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. *See* 29 U.S.C. §2614(a)(1). Furthermore, the taking of FMLA leave under section 2612 shall not result in the loss of any employment benefit accrued prior to the date on which the leave commended. *See* 29 U.S.C.§2614(a)(2). Defendant has violated these provisions of the FMLA by terminating Plaintiff while she was on FMLA.

(Dkt. No. 1 at ¶ 25).

In this case, the summary judgment evidence shows that Time Warner afforded Trautman all the FMLA leave she requested, and in fact more. She does not assert that she was demoted, that her pay was decreased, or that she was denied any other benefit other than continuing intermittent FMLA leave after she was terminated. The only "interference" with leave that occurred took place when she was terminated for excessive absences and was no longer entitled to FMLA leave. The Fifth Circuit has held that when a plaintiff receives the leave she requests and returns to the job she left, she has no interference claim as a matter of law. *See De La Garza–Crooks v. AT & T*, No. 00–50969, 2001 WL 361099, at *1 (5th Cir. Mar.22, 2001); *see also Carroll v. Sanderson Farms, Inc.*, No. H10–3108, 2012 WL 3866886, at *21 (S.D.Tex. Sept.5, 2012).

Trautman attempts to argue that the failure to retroactively apply her leave approval of up to two hours a day, granted on March 20, 2015, to absences occurring before March 2, 2015 interfered with her FMLA rights. She asserts that starting on January 14, 2015, Time Warner should have designated all the leave she took for two hour periods or less as FMLA leave. She relies on the March 20, 2015 certification letter, which states:

> On January 14, 2015, Sedgwick became aware of your request to rake Family and Medical Leave (FML) leave due to: a serious health condition which makes you unable to perform the essential functions of your job. We have reviewed your request for intermittent leave and have approved your leave under the Federal Family and Medical Leave Act (FMLA) from January 14, 2015 through August 27, 2015. . . .The certification allows for the following frequency and duration: Absences for the Condition: 5 episode(s) per 1 Week(s) with each episode lasting up to 2 Hour(s).

(Dkt. No. 23-6). The Court finds that Sedgwick's failure to certify Trautman's absences occurring before the date of her doctor's note certifying her leave does not qualify as leave interference by Time Warner. (Plaintiff's Ex. 13, Sedgwick Notes at 5). Sedgwick advised Trautman that the frequency and duration of her intermittent leave would be updated effective the date Sedgwick received the updated certification, which was March 2, 2015. Trautman was in fact granted all the FMLA leave she requested and for which she provided supporting medical documentation. Trautman cannot make out an interference claim based on the failure to retroactively afford her FMLA leave.

Despite her denomination of it, Trautman bases the gravaman of her FMLA claim on her termination. In these circumstances, an FMLA interference claim is properly denied. *See Spears v. Louisiana Dep't of Pub. Safety and Corr.*, 2014 WL 905185, at * 3 (M.D. La. March 7, 2014) (dismissing interference claim where plaintiff asserted both retaliation and interference because interference claim was essentially a retaliation claim); *Lister v. Nat'l Oil Well Varco, L.P.*, 2013 WL 5515196, at * 29 (S.D. Tex. Sept. 30, 2013) (construing interference claim as a retaliation claim). Thus the Court addresses Trautman's FMLA retaliatory discharge claim below.

### 2. Retaliation claim

Trautman alleges that Time Warner retaliated against her for taking the FMLA leave by terminating her employment. The FMLA prohibits retaliation by an employer based on an employee's use of FMLA leave. 29 U.S.C. § 2615(a)(2). To establish retaliation under the FMLA,

14

a plaintiff must present either direct evidence of the employer's retaliatory intent, or circumstantial evidence under the burden shifting framework established in *McDonnell Douglas*.

### a. Direct evidence

Trautman contends that she has direct evidence of FMLA retaliation, in the form of the termination notice Greth prepared, which listed as grounds for the termination eight absences Trautman claims were covered by requested FMLA leave. (Dkt. No. 23, Exs. 8, 9). This argument is based on Trautman's claim (discussed above) that her March 2015 doctor's note supporting an increase in her FMLA leave from one hour per week to two hours per day, per week should have been applied retroactively. If the note is applied retroactively, then the eight dates included in Greth's list of unapproved absences triggering the termination would have been absences covered by FMLA leave—and thus, according to Trautman, would be direct evidence that she was retaliated against for taking FMLA leave.

In this argument, Trautman relies on the line of cases holding that "statements or documents which show on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action are direct evidence of discrimination." *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003). To constitute "direct evidence" of retaliation, a comment or action must be such that would prove the existence of a fact without any inferences or presumptions. *Ray v. UPS*, 587 Fed. Appx. 182, 187 (5th Cir. 2014) (quoting *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955,958 (5th Cir. 1993). Where an employee submits direct evidence of discrimination, the burden shifts to the employer "to prove by a preponderance of the evidence that the same decision would have been made regardless of the discriminatory animus." *Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 992 (5th Cir. 2005).

Time Warner responds that Sedgwick had denied each of the eight absences because they exceeded the applicable physician's certification. (Dkt. No. 22, Ex. 4, Greth Dep. at 33:13-18; Ex. 22, ViaOne Claim History). Trautman asserts that the leave was wrongly denied because the March 20, 2015, letter from Sedgwick allowed her up to ten hours of FMLA leave a week, and should have applied retroactively to those absences beginning in January when she initially applied for leave. Time Warner asserts Trautman is misconstruing the evidence because the records show that Sedgwick denied FMLA leave for the dates in dispute. (Dkt. No. 22, Defendant's Ex. 22, ViaOne Claim History; Defendant's Ex. 26, ViaOne Claim Summary; Defendant's Ex. 4, Greth Depo. 33:13-18; 50-51). Additionally, Time Warner argues that Trautman's FMLA leave was not a motivating factor in the decision to terminate her, because Greth and Harrell believed all the absences were either unrelated to her intermittent FMLA leave or denied by Sedgwick when they made the decision to terminate her.

First, the Court finds that Trautman has not submitted summary judgment evidence that qualifies as direct evidence of retaliation. In order for Greth and Harrell's consideration of the eight (Trautman asserts nine—but only identifies eight in her pleadings) allegedly FMLA-covered absences in their decision to terminate Trautman to qualify as direct evidence of retaliation, the Court would have to presume the absences were covered by the FMLA. Trautman's only argument that they were covered is her own interpretation of the March 20, 2015, letter from Sedgwick allowing her additional leave and stating the beginning date of that leave was January 14, 2015. (Dkt. No. 23-6). At most, the letter is ambiguous as to what date the 10 hours of week of FMLA certification began, and as such does not constitute direct evidence of discrimination.

Moreover, while Trautman asserts the issue is in dispute, the summary judgment evidence shows that Sedgwick denied FMLA leave for the absences in issue. (Dkt. No. 22, Defendant's Ex. 22, ViaOne Claim History; Defendant's Ex. 26, ViaOne Claim Summary; Plaintiff's Ex. 13, Sedgwick Claim Notes at 5). The record establishes that the grant of additional leave was not retroactive to any date before March 2, 2015, and did not apply to the instances of leave pre-dating March 2, 2015, that Trautman had already been denied. (Dkt. No. 27-3, Plaintiff's Ex. 13, Sedgwick Notes at 5) (advising Trautman that the frequency and duration of her intermittent leave would be updated effective the date Sedgwick received the updated physician's certification, which was March 2, 2015).

Even if Trautman did have direct evidence of retaliation, her claim still fails because Time Warner has offered ample evidence that the same decision would have been taken even without consideration of the allegedly FMLA-covered absences. The record supports that Greth and Harrell terminated Trautman for excessive absences unconnected to her FMLA leave. The termination notice listed 34 absences, so even excluding the eight at issue, there were still 26 absences, more than sufficient to support termination themselves. (Dkt. No. 22, Defendant's Ex. 3 at ¶ 3; Defendant's Ex. 29 at ¶ 4). Trautman missed 20 full days of work between January 5, 2015 and February 27, 2015, or roughly 30% of the workdays in the calendar year up to that point. (Dkt. No. 22, Defendant's Ex. 3, Evans Decl. at ¶ 3; Ex. 27, Termination Form). These absences were unrelated to FMLA leave and Trautman did not request FMLA leave for these absences. The eight absences in issue constitute only eight of 200 hours Trautman was absent from January 2015 to April 2015. Even if inclusion of the eight absences is considered direct evidence of discrimination, the evidence conclusively shows that Time Warner still would have terminated Trautman for excessive absences.

### b.    *McDonnell Douglas* **analysis**

To establish a prima facie case of retaliation under the FMLA, a plaintiff must show that "(1) she was protected under the FMLA; (2) she suffered an adverse employment decision; and either (3a) that she was treated less favorably than an employee who had not requested leave under the FMLA; or (3b) the adverse decision was made because she took FMLA leave." *Hunt v. Rapides Healthcare Sys.*, 227 F.3d 757, 768 (5th Cir. 1999).  If a plaintiff carries her initial burden, the burden shifts to the defendant "to articulate a legitimate nondiscriminatory or nonretaliatory reason for the employment action."  *Id.*  If the employer articulates a reason, the burden shifts to the plaintiff to prove by a preponderance of the evidence that the employer's reason "is a pretext for retaliation." *Id.*

Time Warner does not dispute that Trautman can show she was covered by the FMLA and that she suffered an adverse employment action.  However, Time Warner asserts that Trautman has failed to submit summary judgment evidence that she was treated less favorably than employees who did not seek FMLA leave, and that she was terminated because she sought FMLA leave.  Trautman does not dispute that she has failed to identify any similarly situated comparators; instead, she argues she was terminated because she sought FMLA leave.  Again she relies on the inclusion of the alleged FMLA-related absences listed on her termination form as the cause of her termination.  The Court has already addressed this evidence and found that the summary judgment evidence shows that Sedgwick denied Trautman FMLA leave for the dates in issue. (Dkt. No. 22, Defendant's Ex. 22, ViaOne Claim History; Defendant's Ex. 26, ViaOne Claim Summary; Defendant's Ex. 4, Greth Depo. 33:13-18; 50-51).

Despite Trautman's inability to make out a prima facie case, the Court will nonetheless address the remainder of the *McDonnell Douglas* factors, as that analysis demonstrates further that

the retaliation claim should be dismissed. Had Trautman shown a prima facie case, the next step would be to determine if there was evidence of a legitimate non-discriminatory reason to support Time Warner's termination. Time Warner has presented such evidence, in the form of Trautman's poor attendance. Time Warner provides evidence that, excluding all of Trautman's FMLA covered leave, and leave Trautman claims was covered, Trautman missed twenty days of work in the first three and a half months of 2015, all of which were unrelated to her alleged anxiety disorder and none of which were based on a request for FMLA leave. (Dkt. No. 22, Defendant's Ex. 3, Evans Decl. at ¶ 3).(Ex. 27, Termination Form). This is sufficient to carry Time Warner's burden on this step.

The burden thus shifts to Trautman to establish that Time Warner's stated reason for discharging her was actually a pretext for discrimination. *Hunt*, 277 F.3d at 768. Trautman must "produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 233 (5th Cir. 2015). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id.* An explanation is pretextual, "if it is not the real reason for the adverse employment action." *Id.* At the pretext stage, the issue is "whether [the employer's] reason, even if incorrect, was the real reason for [the plaintiff's] termination." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002)). In pretext cases, it is not enough that the company was wrong about the underlying facts that motivated the adverse employment action. The question is whether the employer had a good-faith belief that the facts that motivated the adverse action were true. *Jackson v. Cal–W. Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010).

Trautman argues that Time Warner's reason for firing her is pretextual because Greth admitted in her deposition that there was no written attendance policy that applied to Trautman. Greth testified she considered all the absences, including those Trautman asserts are covered by the FMLA, that Trautman still had vacation time available at the time of termination, and that Greth advised Trautman at the time of her final absence on April 8, 2015, that she still had some sick time.

Trautman has failed to carry her burden on pretext. Trautman has pointed to no caselaw standing for the proposition that the absence of a written attendance policy is evidence of pretext in a case where a firing is based on excessive absences. Moreover, the summary judgment evidence shows that Greth clearly warned Trautman on February 24, 2015, and March 2, 2015, that another unplanned absence would result in termination. (Defendant's Ex. 21, 23, Plaintiff's Ex. 10). Despite this warning Trautman still continued to miss work. (Dkt. No. 22, Ex. 27, Termination Form). Greth testified that the expectation for professionals such as Trautman is that "you're expected to be at work the majority of the time." (Dkt. No. 22, Ex. 6 at 18). Time Warner's lack of an attendance policy applying to Trautman is not enough to show that its stated reason for firing Trautman was pretextual.[3]

Additionally, even if the eight days at issue did qualify as FMLA excused absences, the summary judgment evidence establishes that Harrell and Greth believed they were not covered by the FMLA. *Jones v. Overnite Transp. Co.*, 212 Fed.Appx. 268, 275 (5th Cir. 2006) ("An employer

---

[3]The Court has already determined that no fact issue exists about Trautman's argument that Greth discriminatorily considered eight absences covered by the FMLA in deciding to terminate her, concluding that the absences did not qualify as FMLA leave. (Dkt. No. 27, Ex. 22 ViaOne Claim Summary (listing absences on January 15, January 21, January 22, January 26, January 27, January 28, February 9, and February 11 were denied FMLA leave), Ex. 3 (Stating "we can update the frequency and duration for flareups effective the date we received the updated paperwork (3/2/15)").

can make an incorrect employment decision; if based on a good faith belief with no discriminatory influences, then the court will not try the validity of the reason.").  The ViaOne System reflected that the eight absences were not covered by FMLA leave.  Harrell testified that she was not aware of any conflict in Trautman's certification dates when she reviewed ViaOne, and determined that Sedgwick had not approved for FMLA leave the eight absences identified by Greth in the termination document.  (Dkt. No. 22, Ex. 29, Harrell Decl.; Dkt. No. 27, Ex. 7 Harrell Depo. at 67).  Greth testified that she reviewed Trautman's FMLA leave through Sedgwick and did not consider absences documented as approved FMLA leave in the absences she listed on Trautman's termination notice.  (Dkt. No. 23, Ex. 10, Greth Depo. at 33, 50, 83-86).  Additionally, Greth testified she would have had no way of knowing if Sedgwick's records were in error.  (Dkt. No. 23, Ex. 10 Greth Depo. at 85, 87).  While Trautman makes much of the fact that Greth and Harrell did not log on to Sedgwick just prior to Trautman's termination, this does not change the fact that the "denied" status of these eight absences remained unchanged from the time Harrell and Greth reviewed them on March 2, 2015, until Trautman's termination.  (Dkt. No. 27, Ex. 13, Sedgwick notes).

With regard to the argument that Trautman still had leave time available, and thus Time Warner did not really consider her absences excessive, this argument is meritless. On the February 24, 2015, Corrective Action Form, Greth informed Trautman "On February 9th, we spoke about the fact that you were out of accrued sick time and had utilized all your personal time for the year.  I advised you that all future absences would be utilizing vacation time. . . you are expected to notify your manager by phone of any absent time."  (Dkt. No. 23, Ex. 21).  On the March 2, 2015, Corrective Action Form, Greth informed Trautman:

> On the afternoon of Monday 2/23 we discussed . . .the fact that you were out of
> personal time and out of accrued time for sick and vacation. I also discussed with you

> that any time off at this point would need to be pre-approved. . . . On the morning of 2/24 I reviewed your current attendance which included 19 total days out of the office since 1/2/2015, this equates to a total of 179 hours. . . because of your actions your are being issued a Final Written Warning. . . .

(Dkt. No. 23, Ex. 23). Thus, while Trautman might have had some negligible sick time available at the time she was terminated, this does not qualify as evidence of pretext. The summary judgment evidence supports that Time Warner found Trautman's continued absences to be excessive.

Lastly, Trautman asserts and that Greth advised Trautman at the time of her final absence on April 8, 2015, that she still had some sick time left thereby leading Trautman to believe the absence was excused. However, the evidence does not support that Greth excused the absence or that she informed Truatman she would. Greth had earlier advised Trautman that another unplanned absence would lead to her termination. (Dkt. No. 23, Exs. 21, 23).

There are no genuine issues of material fact precluding summary judgment on Trautman's claims of retaliation and discrimination in violation of the ADA, the Texas Labor Code or the FMLA. Additionally, Trautman has failed to present direct evidence of discrimination and her motion for partial summary judgment should be denied.

## III. RECOMMENDATION

Based upon the foregoing, the undersigned Magistrate Judge **RECOMMENDS** that the Court **GRANT** Defendants' Motion for Summary Judgment (Dkt. No. 22) and **DISMISS** all of Plaintiff claims **WITH PREJUDICE**. Additionally, the Court **RECOMMENDS** that Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 23) be **DENIED**. The Magistrate **FURTHER RECOMMENDS** that the District Court enter judgment that Plaintiff take nothing on her claims against Time Warner.

## IV. WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(c); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED this 1st day of December, 2017.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE